IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 120-072 |
| | ) | |
| CARLOS TERRELL KEITH | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant seeks suppression of a firearm found when officers conducted a search of a car in which he was a passenger on August 3, 2019, during a traffic stop for a defective brake light. After careful consideration of the briefs and evidence presented at the hearing on October 27, 2021, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress be **GRANTED**. (Doc. no. 21.)

## I.    BACKGROUND

On September 2, 2020, a grand jury in the Southern District of Georgia charged Defendant with one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1). (Doc. no. 1.) The traffic stop underlying this charge began at approximately 8:00 p.m. on August 3, 2019, when a Richmond County crime suppression team pulled over a car driven by Shaqueyah McClendon because of a defective brake light. (Court's recording system, *For the Record* ("FTR"), 09:07:11-09:08:24.)[1] Defendant was sitting in the

---

[1]The Court cites to FTR because the transcript of the hearing is not yet available.

front passenger seat, and another adult passenger was sitting in the back seat with three minor children.  (See id. at 09:21:10-09:21:47.)

Deputy Desmond Wells of the Richmond County Sherriff's Office was the sole testifying witness at the suppression hearing, and his body camera footage is also informative. (Id. at 09:04:55-09:05:18, 09:09:34-09:20:34; Body Camera, doc. no. 34-1 ("BWC").)  When Deputy Wells first pulled over Ms. McClendon, he turned on his body camera, exited his patrol car, and approached Defendant on the passenger side while Deputy Tyler Wilcher approached the driver side.  (BWC 00:00-00:23; FTR 09:21:07-09:21:13.)  The officers greeted Defendant and Ms. McClendon, took their driver's licenses, and obtained the name of the back seat adult passenger.  (BWC 00:23-01:50; FTR 09:21:14-09:21:47.)  Deputy Wilcher asked Ms. McClendon, "You know you got a brake light out, right?", which she acknowledged and commented the cause could be a short in the light.  (BWC 00:23-00:34.)

Deputy Wells returned to his patrol car and performed a records check on the name of the back seat passenger while Deputy Wilcher did the same for Ms. McClendon and Defendant.  (Doc. no. 27, p. 2; BWC 01:50-03:05; FTR 09:22:07-09:22:33.)  Because these checks primarily concern the status of driver's licenses and existence of any warrants, and do not provide complete criminal histories, the officers did not learn of Defendant's felony history at that moment.  (Doc. no. 27-2, p. 2; FTR 09:22:40-09:23:04.)  Upon completing the check on the back seat passenger, Deputy Wells walked to Deputy Wilcher's patrol car and informed his fellow officers of the results.  (BWC 03:05-03:24.)  Deputy Wilcher had just completed the checks on Defendant and Ms. McClendon and was waiting in his car as Deputy Wells approached.  (Id.)

Deputy Wells leaned into the patrol car window, and Deputy Wilcher told Deputy Wells, "He's a G-Shine Blood, as a matter of fact," referring to gang affiliation information in Defendant's records check.   (See id. at 03:25-03:27; FTR 09:24:00-09:24:24.)   After a moment, Deputy Wilcher added, "they got the kids . . . you see the kids back there?" to which Deputy Wells responded, "Yeah, they deep, man," meaning the children were not properly secured in car seats.   (Doc. no. 27-2, p. 3; BWC 03:28-03:39; FTR 09:24:30-09:24:50) Because Deputy Wells was in charge of this traffic stop,  Deputy Wilcher asked, "What do you want to do, Wells?  I don't care."  (BWC 03:40-03:45; FTR 09:23:22-09:23:40, 09:24:53-09:25:10.)   Deputy Wells did not respond but instead walked to the driver side of Ms. McClendon's car and engaged in the following dialogue with Ms. McClendon:

| | |
|---|---|
| Deputy Wells: | "How you doing.  Is, um, do you mind if we search your car, ma'am?" |
| Ms. McClendon: | "Search my car for what?" |
| Deputy Wells: | "It's either a yes or no." |
| Ms. McClendon: | "If I say no then what?" |
| Deputy Wells: | "Is this a yes or no?" |
| Ms. McClendon: | "I mean, if y'all pulled me over for a headlight, why y'all need to search my car? |
| Deputy Wells: | "All right." |

(BWC 03:46-04:21.)  When Ms. McClendon declined consent, Deputy Wells walked to the other side of Ms. McClendon's car and announced to the officers, "Hey, uh, it's a no." An officer asked, "He said or she said?" to which Deputy Wells replied, "She said," and walked back to Deputy Wilcher's patrol car.  (BWC 04:22-04:45.)

Deputy Wells testified gang affiliation had nothing to do with his decision to ask for consent to search.  (FTR 09:25:43-09:25:50.)  Instead, Deputy Wells asked for consent because Ms. McClendon appeared nervous and was smoking, and he wanted to investigate crimes other than the traffic violations.  (Id. at 09:25:23-09:25:40; 09:35:20-09:35:44, 09:38:38-09:39:25, 09:45:41-09:46:59.)  He needed consent because he lacked probable cause to conduct a search.  (See id. at 09:45:41-09:46:59.)  Deputy Wells testified he routinely asks for consent to search before a dog sniff because conducting a sniff without first asking for consent could potentially escalate a situation.  (Id. at 09:28:24-09:29:38.)  He further testified he asks for consent to search at every traffic stop.  (Id. at 09:50:33-09:50:40.)

Returning to Deputy Wilcher's patrol car, Deputy Wells declared, "I'm going to start writing tickets," and took Ms. McClendon's driver's license from Deputy Wilcher, who suggested they write a warning instead.  (BWC 04:45-05:10; FTR 09:26:47-09:26:54.)  Deputy Wells gave a trainee officer Ms. McClendon's driver's license and instructed him to run her name and write a warning for a defective brake light.  (BWC 05:11-06:12; FTR 09:26:04-09:26:22, 09:26:59-09:27:25.)  After watching the body camera footage in court, Deputy Wells testified the trainee began writing the warning after Deputy Wells returned from Ms. McClendon's car and instructed the trainee to write the warning.  (FTR 09:46:40-09:50:013.)

While the officers discussed whether to issue a warning or citation, an officer conducted a dog sniff of the car at Deputy Wells' request, and at six minutes and twelve seconds, the dog alerted on the passenger side of the car.  (Doc. no. 27, p. 3; BWC 06:12-06:26; FTR 09:27:33-09:27:48.)  Deputy Wells and the other officers ordered Defendant and the passengers to step out of the car, which they did.  (BWC 06:27-06:55.)  Deputy Wells patted down Defendant and searched his side of the car, finding a Smith & Wesson SD9, 9mm pistol in a bag

4

underneath the passenger seat. (Doc. no. 1, p. 1; BWC 06:56-09:10; FTR 09:27:48-09:28:06.) Defendant spoke with the officers about the gun and his criminal history. (FTR 09:28:07-09:28:21.)

Deputy Wells returned to his car to run a check on the gun with the help of the trainee officer. He told the trainee, "You're at a traffic stop. You gotta be a little bit faster," as they waited for a response on the gun check. (BWC 09:11-11:55; FTR 09:29:42-09:30:23.) After determining the gun was not stolen, Deputy Wells casually asked Defendant what he did for work, then checked on the trainee officer who was still writing the warning. (BWC 11:56-12:22.) Deputy Wells began to help the trainee with the warning and engaged in conversation concerning the traffic stop with other officers while waiting for the trainee to finish. (Id. at 12:23-14:38.)

The officers arrested Defendant for felon in possession of a firearm and handcuffed him. (Id. at 14:39-16:25.) While Defendant talked to officers and made a phone call, Deputy Wells continued with the traffic stop and told Ms. McClendon he would give her a warning for the brake light only and would take no action concerning the unrestrained children. (Id. at 16:26-17:00.) After conferring with other officers, Officer Wells recapped the traffic stop and search with the trainee as he prepared the arrest report. (Id. at 17:01-23:37.) Deputy Wells' body camera footage ends after nearly twenty-four minutes with Ms. McClendon's car still parked. (Id.)

## II.   DISCUSSION

Defendant argues the gun should be suppressed because the officers impermissibly prolonged the traffic stop and exceeded its purpose when (1) Deputy Wells conferred with Deputy Wilcher regarding the results of their respective records checks; (2) Deputy Wells

asked Ms. McClendon for consent to search her car and informed the officers of her answer; and (3) the trainee officer ran Ms. McClendon's name a second time while writing a warning. (Doc. no. 29, pp. 3-4.)  The government argues the stop was not unlawfully extended because all tasks performed by the officers were ordinary, permissible, and related to the traffic stop, including Deputy Wells' request for consent to search the car.  (Doc. no. 27, pp. 5-6.)  Because Defendant concedes the officers had reasonable suspicion to conduct the traffic stop and probable cause to search the car after the dog alerted,  (see doc. no. 21, p. 9), the sole question is whether the officers impermissibly prolonged the traffic stop at any point before the dog alert.  United States v. Hernandez, 418 F.3d 1206, 1210 (11th Cir. 2005).  As explained below, Deputy Wells impermissibly prolonged the stop by asking for consent to search the car.

A.     **Constitutional Framework**

"Because a routine traffic stop is only a limited form of seizure, it is more analogous to an investigative detention than a custodial arrest[, and] [t]herefore, we analyze the legality of these stops under the standard articulated in Terry v. Ohio, 392 U.S. 1 (1968)."  United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (citations omitted).  The reasonableness of an investigative stop turns on two inquiries:  (1) whether the stop was reasonable at its inception, and (2) whether the stop became unreasonable in scope or duration.  See United States v. Street, 472 F.3d 1298, 1306 (11th Cir. 2006); see also United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004). More specifically, an "officer's actions during a traffic stop must be 'reasonably related in *scope* to the circumstances which justified the interference in the first place.'"  Purcell, 236 F.3d at 1277 (quoting Terry, 392 U.S. at 20).

Thus, a traffic stop may last no longer than is necessary to address the traffic violation and related safety concerns.  Rodriguez v. United States, 575 U.S. 348, 354-55 (2015).  "An officer

6

'may conduct certain unrelated checks during an otherwise lawful traffic stop' so long as the officer does 'not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.'" United States v. Braddy, 11 F.4th 1298, 1310 (11th Cir. 2021) (quoting Rodriguez, 575 U.S. at 356).  Ordinary inquiries incident to a traffic stop include checking the driver's license, checking for outstanding warrants, inspecting the car's registration and insurance, identifying other passengers in the car, and asking questions about travel plans.  See, e.g., Rodriguez, 575 U.S. at 355; United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003); United States v. Henderson, No. 2:20-CR-28, 2021 WL 3684149, at *8 (S.D. Ga. May 12, 2021), adopted by, 2021 WL 3030186 (S.D. Ga. July 19, 2021).  "Because they 'serve the same objective as enforcement of the traffic code'—namely, 'ensuring that vehicles on the road are operated safely and responsibly'—those inquiries do not unconstitutionally extend the traffic stop." United States v. Vargas, 848 F.3d 971, 974 (11th Cir. 2017) (quoting Rodriguez 575 U.S. at 355).

Questions unrelated to the initial stop are permissible only if there is reasonable suspicion or "if the initial detention has become a consensual encounter."  United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999).  Unrelated inquiries include, for example, a dog sniff, questions about employment or gang affiliation, or questions concerning whether the driver is transporting luggage, weapons, or illegal items.  See, e.g., Rodriguez, 575 U.S. at 356; Arizona v. Johnson, 555 U.S. 323, 329 (2009); United States v. Byron, 817 F. App'x 753, 756 (11th Cir. 2020) (per curiam); Pruitt, 174 F.3d at 1221.  An officer can no longer gain "bonus time" to ask questions unrelated to the stop by completing traffic-related tasks expeditiously. Rodriguez, 575 U.S. at 357.  "The critical question . . . is not whether the [unrelated inquiry] occurs before or after the officer issues [the] ticket . . . but whether conducting the [unrelated

inquiry] 'prolongs' – i.e., adds time to – 'the stop.'" Id. Even one unrelated question adding a few seconds to the stop's duration might constitute a violation. Henderson, 2021 WL 3684149, at *27.

> **B.** **Deputy Wells Impermissibly Prolonged the Traffic Stop by Asking for Consent to Search the Car When Other Officers Were Not Performing Any Tasks Related to the Traffic Stop**

Defendant argues Deputy Wells prolonged the traffic stop for approximately fifty seconds when he asked Ms. McClendon for consent to search her car and informed the other officers of her declination. The Court agrees. Before asking for consent to search, Deputy Wells conferred with Deputy Wilcher and determined there was a basis for charging Ms. McClendon with a broken brake light and unrestrained children. When Deputy Wilcher asked Deputy Wells what he wanted to do as the officer in charge of the traffic stop, Deputy Wells walked away without explanation. He returned to Ms. McClendon's car and asked for consent to search, then informed the other officers of her declination. Only upon announcing the declination did Deputy Wells announce his decision to issue a warning for the brake light, at which point the officers resumed the process of wrapping up the traffic stop while the dog sniff was conducted.

During this fifty-second interlude, no officer was "engaged in procedures reasonably necessary for the completion of [the stop's] purpose – issuing a citation." United States v. Wilson, 662 F. App'x 693, 696 (11th Cir. 2016) (per curiam); cf. Illinois v. Caballes, 543 U.S. 405, 408 (2005) (dog sniff did not extend stop because duration of stop was "entirely justified by . . . the ordinary inquiries incident to such a stop"); Braddy 11 F.4th at 1311 (no delay when unrelated investigation occurred while other officer "was engaged in conducting a routine records check"). Accordingly, the stop became unreasonable in scope and duration when Deputy Wells

8

detoured from the original purpose to ask for consent so that he could investigate other potential crimes.

The government argues asking for consent to search is related to the mission of a traffic stop and cites in support United States v. Purcell, in which the Eleventh Circuit observed that "an officer conducting a routine traffic stop may request consent to search the vehicle."  236 F.3d 1274, 1281 (11th Cir. 2001) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)).  The Eleventh Circuit made the same observation in United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999), which this Court recently cited in dicta for the same proposition when listing permissible inquiries during a traffic stop.  United States v. Scott, CR 120-028, 2021 WL 5411955, at *2 (S.D. Ga. July 13, 2021).  However, the blanket proposition that officers can always ask for consent to search during a traffic stop is no longer good law after Rodriguez. This conclusion is clear from Rodriguez itself but also two post-Rodriguez decisions from the Eleventh Circuit.

In United States v. Forget, 853 F. App'x 534, 536 (11th Cir. 2021), *cert. denied*, No. 21-5768, 2021 WL 5167899 (U.S. Nov. 8, 2021), officers pulled over a truck after witnessing the defendant, a passenger, not wearing his seatbelt.  One officer questioned the driver and asked him for consent to search the truck, which the driver declined.  Id.  Simultaneously, a second officer asked the defendant and another passenger for identification.  Id.  Concerning whether the traffic stop was impermissibly delayed by the consent question, the Court held:

> Although [the officer's] *request to search the car was not related to the purpose of the stop*, it occurred simultaneously with [the other officer's] inquiries into [defendant's] identification, and thus it did not add any time to the stop beyond the time it took to complete inquiries incident to the seatbelt violation.

Id. at 539 (emphasis added) (citing Rodriguez, 575 U.S. at 355; Arizona v. Johnson, 555 U.S. 323, 327-28 (2009)).  Similarly, in United States v. Vargas, 848 F.3d 971, 972 (11th Cir. 2017), the Eleventh Circuit held officers permissibly asked for consent to search a car because they were still engaged in tasks related to the traffic stop when the question was posed and did not add any time to the stop by asking the question.  In contrast to the officers in Forget and Vargas, Deputy Wells exceeded the scope of the stop and impermissibly prolonged it by asking for consent to search when no tasks related to completion of the traffic stop were being performed.

This outcome does not, as the government suggests, mean officers "always will not be able to ask for consent to search the car."  (FTR 09:57:33-09:57:56; see doc. no. 27, p. 8.)  To the contrary, as evidenced by Vargas and Forget, officers are permitted to ask for consent to search so long as the question is posed while active progress is being made to complete the traffic stop.  See Rodriguez, 575 U.S. at 355 ("an officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop."); Johnson, 555 U.S. at 333 (unrelated inquires allowed "so long as those inquiries do not measurably extend the duration of the stop").

**C.   Defendant's Remaining Two Criticisms of the Traffic Stop Are Unavailing**

For the sake of completeness, the officers did not impermissibly prolong the stop when Deputies Well and Wilcher took forty-two seconds to confer regarding their records checks and observations before Deputy Wells asked for consent to search.  Officers working a traffic stop together should be afforded reasonable time to confer before making the important decision of what charges to bring, if any, and determining the proper next steps to conclude a traffic stop.  See United States v. Burwell, 763 F. App'x 840, 852 (11th Cir. 2019) (per curiam) (briefing fellow officer was necessary to ensure safety at traffic stop), cert. denied, 140 S. Ct. 579 (2019); cf. United States v. Anguiano, 791 F. App'x 841, 849 (11th Cir. 2019) (per curiam)

(finding unconstitutional prolongation when, after recapping traffic stop, two officers discussed strategy for searching truck for drugs without probable cause).

Nor is there any concern with the trainee conducting a second records check on Ms. McClendon while preparing the traffic warning.  Defendant cites United States v. Clark, 902 F.3d 404, 407 (3d Cir. 2018), to argue running the name again was "redundant and prolonged the stop."  (Doc. no. 29, p. 4)  In Clark, the Third Circuit held duplicative questions about a driver's criminal history after running a records check were not "tied to the traffic stop's mission."  Clark, 902 F.3d at 410-11.  Here, in contrast, the trainee conducted the second check of Ms. McClendon at Deputy Wells' suggestion for the sole purpose of reducing rather than prolonging the time needed to write the warning ticket, and this task was directly related to the mission of the traffic stop.

### D.    The Exclusionary Rule Requires Suppression of the Firearm

The judicially created remedy known as the exclusionary rule acts as a deterrent to Fourth Amendment violations by prohibiting admission of the resulting evidence.  United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002).  However, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies."  Herring v. United States, 555 U.S. 135, 140 (2009) (citing Illinois v. Gates, 462 U.S. 213, 223 (1983)).  "Indeed, exclusion 'has always been our last resort, not our first impulse.'"  Id. (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)).  To warrant exclusion, "the benefits of deterrence must outweigh the costs," and the principal cost is "letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system."  Id. at 141 (citations and internal quotations marks omitted).  "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield

11

'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'"  Davis v. United States, 564 U.S. 229, 240 (2011) (quoting Herring, 555 U.S. at 144).  The government makes no arguments regarding whether the exclusionary rule applies.

The Court would not apply the exclusionary rule if the officers prolonged the traffic stop "in objectively reasonable reliance on binding appellate precedent."  Davis, 564 U.S. at 232.

> [W]hen binding appellate precedent specifically authorizes a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities.  An officer who conducts a search in reliance on binding appellate precedent does no more than "act as a reasonable officer would and should act" under the circumstances.

Davis, 564 U.S. at 241 (quoting United States v. Leon, 468 U.S. 897, 920 (1984)).

Rodriguez prohibited the officers from prolonging the traffic stop in the absence of reasonable suspicion of a crime other than the traffic violation.  Defendant's traffic stop occurred on August 3, 2019, four years after Rodriguez and two years after the Eleventh Circuit's decision in Vargas.  "Responsible law enforcement officers will take care to learn 'what is required of them' under Fourth Amendment precedent and will conform their conduct to these rules."  Id. (quoting Hudson, 547 U.S. at 599).  Accordingly, while exclusion is a remedy to be applied sparingly, binding precedent leaves the Court no choice but to apply it here: "Under the exclusionary rule, evidence obtained in an encounter that is in violation of the Fourth Amendment . . . cannot be used in a criminal trial against the victim of the illegal search and seizure."  United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003); see also Forget, 853 F. App'x at 538 ("If a traffic stop is unlawfully prolonged and violates the Fourth Amendment, any evidence collected may be suppressed under the exclusionary rule.").

## III.   CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress be **GRANTED**.  (Doc. no. 21.)  All firearm evidence obtained during the traffic stop should be suppressed and inadmissible at trial.

SO REPORTED and RECOMMENDED this 2nd day of December, 2021, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA